[Cite as *State v. Dorsey*, 2018-Ohio-34.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 26831 |
| | : | |
| v. | : | Trial Court Case No. 2015-CR-12 |
| | : | |
| STEVEN DORSEY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 5th day of January, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 North Pioneer Boulevard, Springboro, Ohio 45066
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Steven Dorsey, appeals from the conviction and sentence he received in the Montgomery County Court of Common Pleas after a jury found him guilty of aggravated robbery with a firearm specification. In support of his appeal, Dorsey contends that his indictment should have been dismissed because the statutory provisions governing the mandatory transfer of juvenile cases to adult court, R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b), are unconstitutional. Dorsey also argues that his conviction is against the manifest weight of the evidence. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On January 20, 2015, the Montgomery County Grand Jury returned an indictment charging Dorsey with one count of aggravated robbery with a deadly weapon in violation of R.C. 2911.01(A)(1), a felony of the first degree. The charge also included a three-year firearm specification.

{¶ 3} Dorsey, who was 17 years old at the time of the alleged offense, had previously been charged in the trial court's juvenile division. However, pursuant to R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b), the State filed a motion to have Dorsey's case transferred to the general division so that he could be tried as an adult. Following a hearing on the matter, the juvenile court issued an entry finding probable cause to believe that Dorsey had committed aggravated robbery with a firearm and granting the State's motion to transfer. Accordingly, the juvenile court relinquished its jurisdiction over the case and ordered its transfer to the general division pursuant to the mandatory

transfer provisions in R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b).

{¶ 4} Once Dorsey was indicted in the trial court's general division, Dorsey pled not guilty to the aggravated robbery charge and filed a motion to dismiss the indictment on grounds that the mandatory transfer provisions in R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b) violated his constitutional rights to equal protection and due process, as well as his right to be protected from cruel and unusual punishment. The trial court, however, found no constitutional violation and overruled Dorsey's motion. The matter then proceeded to a two-day jury trial.

{¶ 5} At trial, the State presented the testimony of the victim, Travis Shuttleworth. Shuttleworth testified that around 4:00 p.m. on November 5, 2014, he was on his way to get gas in his red Chevy Trailblazer when he decided to first stop at Main Mart on North Main Street in Dayton, Ohio, to purchase some pork rinds. As he exited Main Mart, he claimed a young man, later identified as Dorsey, stopped him and asked for a dollar. Shuttleworth claimed that he gave Dorsey a dime because he had no other cash on hand.

{¶ 6} Shuttleworth then testified that after he handed the dime to Dorsey, Dorsey asked if he and his two friends could get a ride "down the road." Trial Trans. (July 27, 2015), p. 103, 122. Shuttleworth claimed that Dorsey's two friends were standing at a nearby bus stop while he was talking to Dorsey. Shuttleworth did not recall either of Dorsey's two friends coming up and speaking to him outside Main Mart. Shuttleworth did, however, recall that one of Dorsey's friends was wearing a small red backpack. Shuttleworth further recalled that Dorsey's friends appeared to be 14 to 16 years of age and were bundled up since it was cold outside. Shuttleworth testified that he agreed to give the three of them a ride because he felt bad that they were standing out in the cold.

{¶ 7} Continuing, Shuttleworth testified that Dorsey sat in the front-passenger seat of his vehicle while Dorsey's two friends sat in the backseat. During the ride, Dorsey asked Shuttleworth if he wanted five dollars for gas. Shuttleworth testified that he accepted Dorsey's offer and that Dorsey retrieved five dollars from one of his friends in the backseat. Thereafter, Shuttleworth claimed he stopped at a nearby Marathon gas station and purchased gas for his vehicle.

{¶ 8} After he finished pumping gas, Shuttleworth claimed that Dorsey requested to be dropped off at an apartment complex located across the street from the gas station. Shuttleworth testified that he then drove to the apartment complex and parked. Once parked, Shuttleworth testified that Dorsey's two friends jumped out of the vehicle while Dorsey began "fiddling around." Trial Trans. (July 27, 2015), p. 106. Thereafter, Shuttleworth testified that he noticed Dorsey's two friends standing next to his driver-side door. Shuttleworth then turned around and saw Dorsey pointing a silver and black pistol at him.

{¶ 9} Shuttleworth claimed that he asked Dorsey what was going on and that Dorsey ordered him to empty his pockets. Complying with Dorsey's request, Shuttleworth testified that he produced a cell phone, lighter, and contacts lens case from his pockets, but that Dorsey permitted him to keep the lighter and contacts case. Thereafter, Shuttleworth testified that Dorsey ordered him to "walk that way" and "don't say nothing." Id. In response, Shuttleworth testified that he walked 30 to 40 feet from his vehicle and then started running across the street. As he was running, Shuttleworth heard his vehicle take off down the road. Shuttleworth claimed that he ran to the Marathon gas station where he had previously purchased gas and called 9-1-1 to report

the incident.

{¶ 10} Shuttleworth further testified that Dorsey had a tattoo underneath his right eye that looked like a cross or some other kind of symbol. Shuttleworth did not notice whether either of Dorsey's friends had tattoos on their faces, but claimed that they appeared to be younger than Dorsey and were not that talkative. Shuttleworth also testified that he did not go to Main Mart in search of drugs and that he never asked Dorsey where he could find drugs.

{¶ 11} Following Shuttleworth's testimony, the State called Montgomery County Sheriff's Deputy Brian Shiverdecker to testify. Shiverdecker testified that on November 6, 2014, he was involved in a traffic stop of a red Chevy Trailblazer that had been reported stolen the day before. Shiverdecker testified that he initially spotted the stolen vehicle in the area of North Main Street and Parkwood Drive, which is located near Main Mart. According to Shiverdecker, that area is "pretty common for narcotics and weapons issues." Trial Trans. (July 27, 2015), p. 133.

{¶ 12} Video footage from Shiverdecker's cruiser camera was played for the jury. The video showed Shuttleworth's red Chevy Trailblazer turning into Main Mart's parking lot. As the vehicle turned into the parking lot, the driver, later identified as Dorsey, immediately fled from the vehicle on foot once Shiverdecker activated his lights and siren. In the video, Dorsey is shown wearing a grey hooded sweatshirt and black pants.

{¶ 13} Shiverdecker testified that he chased Dorsey across North Main Street, but lost sight of him while he was running down an alley. Not giving up his pursuit, Shiverdecker testified that he later spotted Dorsey walking by the east side of a nearby house located at 110 East Elmwood Avenue. Shiverdecker testified that Dorsey had on

the same grey hooded sweatshirt and black pants he was wearing when he fled from the vehicle at Main Mart. When taking Dorsey into custody, Shiverdecker also observed that Dorsey had a tattoo underneath his right eye.

{¶ 14} The State next presented the testimony of Montgomery County Sheriff's Deputy Kyle Baranyi. Baranyi testified that he arrived at Main Mart on November 6, 2014, to assist Shiverdecker make a stop on a stolen vehicle. Baranyi claimed that he remained at Main Mart while Shiverdecker chased Dorsey in order to secure the abandoned red Chevy Trailblazer until evidence technicians arrived. Baranyi testified that when he looked inside the vehicle he observed a silver handgun laying on the passenger-side floorboard.

{¶ 15} The State also presented the testimony of evidence technician Eric Bryan. Bryan testified regarding the various photographs he took of the scene and the evidence he collected. Bryan claimed he collected a .40 caliber pistol, 11 .40 caliber rounds, a hairbrush, and a camo mask from the red Chevy Trailblazer that Dorsey fled from. Bryan also performed DNA swabs on the pistol and the interior of the vehicle. He also collected a surveillance video from the Marathon gas station, which was played for the jury.

{¶ 16} The surveillance video from the gas station shows a red SUV pulling up to a gas pump at approximately 4:38 p.m. on November 5, 2014. A male wearing a black jacket and black baseball cap worn backwards then exits the driver's compartment of the vehicle, walks away, and returns to pump some gas. After pumping gas for 30 seconds, the individual returns to the driver's compartment and leaves the gas station at approximately 4:42 p.m. Although the individual pumping gas appeared to match a picture of Shuttleworth that Bryan took on the day of the robbery, Bryan testified that he

could not tell for sure whether the individual pumping gas is Shuttleworth.

{¶ 17} In addition to Bryan's testimony, the State presented the testimony of Emily Draper, a forensic scientist from the Miami Valley Regional Crime Lab.   Draper testified regarding the results of the DNA swabs taken from the pistol, hairbrush, and camo mask collected from the stolen vehicle.   According to Draper, all three pieces of evidence had multiple sources of DNA on them.   Draper testified that tests results showed that another individual, Delaquan Gillis, was the major contributor of DNA on the camo mask, but that Dorsey could not be excluded as a possible contributor of DNA as well.   Draper further testified that Dorsey was the major contributor of DNA on the hairbrush, but that Dorsey's DNA was not found on the pistol.   Nevertheless, Draper later clarified that it was possible Dorsey's DNA could have been present on the pistol at one point in time, but washed off.

{¶ 18} Lastly, the State called Detective Chris Plummer of the Montgomery County Sheriff's Office, who testified regarding his investigation of the robbery.   Plummer testified that he interviewed Shuttleworth and that Shuttleworth's trial testimony was consistent with what he told had told him during their interview.   Plummer further testified that he procured a surveillance video from Main Mart taken on November 5, 2014.   The surveillance video was thereafter played for the jury.

{¶ 19} The surveillance video showed Shuttleworth, who Plummer was able to positively identify in the video, walking into Main Mart at approximately 5:02 p.m. wearing a black jacket and black baseball cap worn backwards.   Shuttleworth meandered around the store for approximately three minutes before he goes to the counter and talks to the cashier.   A few seconds later, two men approach the Main Mart entrance.   One of the men, who is wearing a red backpack, goes inside Main Mart and the other man, who is

wearing a dark hooded sweatshirt, stands outside by the door. The man with the red backpack stands behind Shuttleworth at the counter, and then Shuttleworth immediately exits the store. When Shuttleworth exits the store, the man in the dark hooded sweatshirt standing outside says something to Shuttleworth. Thereafter, Shuttleworth stops and talks to the man wearing the dark hooded sweatshirt and hands him something. Shuttleworth continues to speak with the man outside Main Mart for approximately 45 seconds when the man with the red backpack exits the store and joins them. All three men stand outside Main Mart for a little over a minute and then leave together at approximately 5:07 p.m.

{¶ 20} Although Detective Plummer was able to identify Shuttleworth in the video, Plummer testified that he could not positively identify Dorsey. However, Plummer did indicate that it was his belief that the two men shown in the video talking outside Main Mart were Dorsey and Shuttleworth.

{¶ 21} Following Plummer's testimony, the State rested its case and Dorsey moved for an acquittal pursuant to Crim.R. 29. The trial court denied the motion and Dorsey proceeded to testify in his defense. Specifically, Dorsey testified that on the day in question, he bumped into two of his friends at Main Mart. Although he described the two individuals as friends, Dorsey clarified that he did not know them very well. He identified one of the individuals as Delaquan Gillis, but could not provide a name for the other individual.

{¶ 22} Dorsey claimed that Gillis went inside Main Mart while he and his unnamed companion stood outside. Dorsey testified that when Shuttleworth exited Main Mart, he asked him for a dime, which Shuttleworth gave him. Dorsey next claimed that

Shuttleworth asked him where he could find drugs, specifically "a stem." Trial Trans. (July 28, 2015), p. 203. Dorsey then told Shuttleworth that his companion inside Main Mart, Gillis, could help him find drugs.

{¶ 23} Dorsey claimed that he, Shuttleworth, Gillis, and his unnamed companion stood outside Main Mart while Gillis and his unnamed companion talked with Shuttleworth about how they could work together to find drugs. Dorsey testified that Gillis was shown in the Main Mart surveillance video wearing a red backpack while the unnamed companion could not be seen in the video. Dorsey further claimed that neither of his two companions were ever standing at a bus top as Shuttleworth claimed. Dorsey also claimed that it was not cold outside, and that he never told Shuttleworth that he and his companions wanted a ride because they were cold.

{¶ 24} Continuing, Dorsey testified that he, Gillis, and his unnamed companion got into Shuttleworth's vehicle so that Gillis and his unnamed companion could help Shuttleworth find drugs. Dorsey testified that he gave Shuttleworth five dollars for gas so that Shuttleworth would take him to a friend's house at Northland Village Apartments. When asked why he asked Shuttleworth for a dime at Main Mart if he had five dollars, Dorsey claimed that he wanted to purchase a Black and Mild cigar and did not want to break a dollar bill.

{¶ 25} Dorsey testified that after giving Shuttleworth five dollars, Shuttleworth stopped at a Marathon gas station to get gas and then dropped him off at Northland Village Apartments. According to Dorsey, Gillis and his unnamed companion stayed in the vehicle with Shuttleworth and drove off in search of drugs. In an attempt to pin the robbery on Gillis, Dorsey claimed that Gillis also had a tattoo that looked like letters

underneath one of his eyes.

**{¶ 26}** Dorsey testified that after he was dropped off by Shuttleworth, he spent the night at Northland Village Apartments. Dorsey claimed that he started to walk home around 3:00 or 3:30 p.m. the next day. Dorsey also claimed that while he was walking home, he saw Shuttleworth's vehicle make a U-turn and approach him. Dorsey testified that Gillis and the same unnamed companion he was with the day before were inside Shuttleworth's vehicle without Shuttleworth. Dorsey claimed that Gillis and the unnamed companion told him that Shuttleworth had lent them his vehicle in exchange for getting him drugs. Dorsey claimed that Gillis and the unnamed companion asked if he wanted a ride and if he wanted to smoke marijuana. Dorsey testified that he accepted their offer and then offered to drive them since he was the only one with an operator's license.

**{¶ 27}** Dorsey testified that as he was driving, he noticed a sheriff's cruiser following them. As he turned into Main Mart, he claimed that Gillis and the unnamed companion told him to "pop out and run" when the cruiser's lights and siren activated. Trial Trans. (July 28, 2015), p. 228. Dorsey testified that despite having a driving permit and believing the vehicle was borrowed, he followed their instructions and fled the vehicle as a natural instinct.

**{¶ 28}** With respect to the evidence collected from the stolen vehicle, Dorsey testified that he had his hairbrush with him while he was walking home and that he had placed the hairbrush in the vehicle's center console while driving. He also testified that he saw the camo mask in the backseat of the vehicle, which he claimed was around Gillis's neck the day before. However, Dorsey claimed that he never saw a pistol in the vehicle and that he had no knowledge of the pistol until he was arrested.

{¶ 29} After the defense rested its case and the trial exhibits were admitted, the jury deliberated and found Dorsey guilty of aggravated robbery with the attendant firearm specification. The matter then proceeded to sentencing on August 19, 2015, during which the trial court sentenced Dorsey to eight years in prison for the aggravated robbery charge and three years in prison for the firearm specification. The trial court ordered the three-year prison term to be served prior and consecutively to the eight-year prison term. Accordingly, the trial court sentenced Dorsey to a total of 11 years in prison.

{¶ 30} Dorsey thereafter filed an appeal from his conviction for which his appellate counsel filed a brief under the authority of *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). On September 7, 2016, we rejected Dorsey's *Anders* brief after determining that there was an appealable issue concerning whether the mandatory transfer of Dorsey, a juvenile, to adult court pursuant to R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b) was unconstitutional. We reached this conclusion because the Supreme Court of Ohio had accepted an appeal from our decision in *State v. Aalim*, 2d Dist. Montgomery No. 14-CR-206, 2015-Ohio-892, wherein we held that the aforementioned mandatory transfer provisions in the Revised Code were not unconstitutional. Accordingly, at the time of Dorsey's appeal, the Supreme Court was in the midst of reviewing the constitutionality of those statutory provisions. As a result, Dorsey was appointed new counsel who filed an appellate brief arguing that the trial court should have dismissed Dorsey's indictment on grounds that the mandatory transfer provisions in R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b) are unconstitutional.

{¶ 31} While Dorsey's appeal was pending, the Supreme Court issued a decision on December 22, 2016, holding that "the mandatory transfer of juveniles to the general

division of common pleas court violates juveniles' right to due process as guaranteed by Article I, Section 16 of the Ohio Constitution." *State v. Aalim*, 150 Ohio St.3d 463, 2016-Ohio-8278, 83 N.E.3d 862, ¶ 31 (*"Aalim I"*). However, after the State filed a motion for reconsideration, on May 25, 2017, the Supreme Court issued a reconsideration decision vacating its decision in *Aalim I*, holding the mandatory transfer provisions in R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b) are not unconstitutional. *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 38 ("*Aalim II*").

{¶ 32} In light of the Supreme Court's holding in *Aalim II*, on June 23, 2017, we ordered Dorsey to file a supplemental brief addressing the effect of *Aalim II* and whether Dorsey had any other issues to raise on appeal. In response, Dorsey filed a supplemental appellate brief raising two assignments of error, which are now ripe for review.

**First Assignment of Error**

{¶ 33} Dorsey's First Assignment of Error is as follows:

THE TRIAL COURT ERRED BY OVERRULING APPELLANT'S MOTION

TO DISMISS INDICTMENT.

{¶ 34} Under his First Assignment of Error, Dorsey once again claims that the trial court should have granted the motion to dismiss his indictment on grounds that the mandatory transfer provisions in R.C. 2152.10(A)(2)(b) and R.C. 2152.12(A)(1)(b) are unconstitutional. Dorsey, however, acknowledges that the Supreme Court of Ohio ruled otherwise in *Aalim II*. Specifically, the Supreme Court held in *Aalim II* that "the mandatory bindover of certain juvenile offenders under R.C. 2152.10(A)(2)(b) and 2152.12(A)(1)(b)

complies with due process and equal protection as guaranteed by the Ohio and United States Constitutions." *Aalim II* at ¶ 38. We find that *Aalim II* is dispositive of the constitutional arguments raised under Dorsey's First Assignment of Error, and therefore, overrule his First Assignment of Error.

### Second Assignment of Error

{¶ 35} Dorsey's Second Assignment of Error is as follows:

THE JURY'S VERDICT SHOULD BE REVERSED AS IT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 36} Under his Second Assignment of Error, Dorsey contends that his conviction is against the manifest weight of the evidence because the testimony of the victim, Travis Shuttleworth, lacks credibility.

{¶ 37} "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N .E.2d 717 (1st Dist.1983).

{¶ 38} "The credibility of the witnesses and the weight to be given to their testimony

are matters for the trier of facts to resolve." *State v. McDonald*, 2d Dist. Montgomery No. 27237, 2017-Ohio-8496, ¶ 21, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). " 'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.' " *Id.*, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 39} "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Carpenter*, 2d Dist. Clark No. 2016-CA-66, 2017-Ohio-8905, ¶ 26, citing *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 40} As previously noted, Dorsey claims his conviction is against the manifest weight of the evidence because Shuttleworth's testimony lacks credibility. Upon review of the record, we find that certain aspects of Shuttleworth's testimony are indeed quite dubious. For example, Shuttleworth testified that he decided to give three strangers a ride somewhere "down the road" because it was very cold outside; yet the surveillance video from Main Mart shows that neither Shuttleworth nor the store's other patrons were dressed for extremely cold weather that day, but were wearing light jackets and sweatshirts. Shuttleworth also claimed that Dorsey's two friends "were all bundled up"

and cold. Trial Trans. (July 27, 2015), p. 103. However, no one in the video appeared "bundled up" due to the weather.

{¶ 41} Shuttleworth also testified that it was only he and Dorsey communicating outside Main Mart with no one else around, yet the video shows Shuttleworth standing with at least two individuals outside the store. Shuttleworth also testified that he went to the Marathon gas station with Dorsey and his friends after meeting them at Main Mart, but the clock on the surveillance videos indicates that Shuttleworth left the gas station at 4:42 p.m. and arrived at Main Mart at 5:02 p.m. Accordingly, the sequence of events testified to by Shuttleworth does not match the video evidence.

{¶ 42} That said, Dorsey's testimony has just as many credibility issues. For example, Dorsey testified to the same sequence of events as Shuttleworth, which again does not match the video evidence. Dorsey also testified that he did not know his second companion's name despite initially describing this individual as a friend and being in this individual's company on more than one occasion. Dorsey also testified that he asked Shuttleworth for a dime in order to purchase a Black and Mild cigar, yet he never purchased a cigar at Main Mart after Shuttleworth gave him a dime.

{¶ 43} Dorsey also testified that he was in Shuttleworth's vehicle the day after the robbery because Delaquan Gillis and his unnamed companion just happened to drive by and pick him up while he was walking home. Along with this coincidence, Dorsey testified that Shuttleworth allegedly lent Gillis and the unnamed companion (two teenagers without a driver's license who Shuttleworth had never met before) his vehicle in exchange for getting him drugs. Dorsey also testified that he was unaware of any gun in Shuttleworth's vehicle, yet a pistol was laying on the passenger-side floorboard in plain

sight just before Dorsey fled from the driver's compartment.

{¶ 44} The foregoing examples are only a few of the credibility issues found in both Shuttleworth and Dorsey's testimony. Although both of their stories lack credibility to some extent, it was for the jury to decide which individual's story was more credible with respect to the aggravated robbery charge. The jury did not lose its way and create a manifest miscarriage of justice simply because it found Shuttleworth's version of events more credible than Dorsey's.

{¶ 45} It is clear from the video evidence and Deputy Shiverdecker's testimony that Dorsey was driving Shuttleworth's vehicle the day after Shuttleworth reported it stolen. Dorsey also fled from the vehicle when approached by law enforcement and left a silver and black pistol inside the vehicle that matched the description of the pistol Shuttleworth claimed was used to rob him. Moreover, Shuttleworth identified the pistol that was found in his vehicle as the firearm that was used to rob him. Accordingly, it was reasonable for the jury to conclude that Dorsey, who was driving Shuttleworth's stolen vehicle and had access to the firearm that was used to rob Shuttleworth, robbed Shuttleworth at gunpoint as Shuttleworth testified. The jury was also free to consider the forensic scientist's testimony that although Dorsey's DNA was not present on the gun during the lab testing, that his DNA could have been present at some other point in time and washed off.

{¶ 46} While there may be more to the story concerning the reason behind Shuttleworth and Dorsey's encounter on November 5, 2014, at the end of the day, the evidence does not weigh heavily against finding that Dorsey robbed Shuttleworth of his vehicle at gunpoint. Therefore, upon a review of the record in its entirety, we conclude that this is not one of those exceptional cases that requires a reversal of the conviction.

{¶ 47} Dorsey's Second Assignment of Error is overruled.


**Conclusion**

{¶ 48} Having overruled both assignments of error raised by Dorsey, the judgment

of the trial court is affirmed.


. . . . . . . . . . . . .


HALL, P.J. and FROELICH, J., concur.


Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
Marshall G. Lachman
Hon. Steven K. Dankof